Filed 11/6/25  P. v. Bulkin CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KEITH JEFFERY BULKIN,<br><br>    Defendant and Appellant. | F086463<br><br>(Super. Ct. No. CRF69666)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Heather Monasky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Keith Jeffery Bulkin and his crime partner Thomas Bacigalupi went into a Sonora grocery store where each attempted to use counterfeit $50 bills to buy small

items and get legitimate cash in change. After the store employees rejected them, the two took their bills back, used other money for their purchases, and left the store. The store manager called police who quickly stopped their car nearby. A search of the car and the two men uncovered 39 counterfeit $50 bills, along with property and receipts for numerous recent purchases — including returns for cash refunds — that had been made in a trail throughout the Bay Area and Central California.[1]

A jury convicted Bulkin of felony conspiracy (Pen. Code,[2] § 182, subd. (a)(1); count 1), misdemeanor passing a fictitious bill (§ 476; count 2),[3] and felony possession of counterfeit bills worth more than $950 (§§ 475, subd. (a) & 473; count 3).

Bulkin separately admitted a 2006 burglary conviction that had been alleged as a strike. (§§ 667, subd. (d) and 1170.12, subd. (b).) However, nothing other than the date and Contra Costa County location of that prior conviction was alleged or admitted, and thus no details or circumstances of that offense were ever provided.

The prosecution had alleged five aggravating sentencing factors in their pleadings (Cal. Rules of Court,[4] rule 4.421(a) & (b)), but it produced no evidence in support of any of them, either to the jury or separately to the trial court. Bulkin did not waive his right to a trial on these five aggravating factors, nor did he admit any of them.

---

[1] Bulkin was charged and tried separately. The record does not reveal what happened to Bacigalupi. The current case was "a refile of a case based on the same conduct … which got close to trial" before the prosecution dismissed it when evidentiary problems arose. At one point, Bulkin obtained a continuance of the trial date in order to try to find Bacigalupi as a defense witness, but he did not succeed.

[2] All undesignated statutory references are to the Penal Code.

[3] For unknown reasons, the prosecutor originally charged Bulkin in Count 2 for passing fictitious bills worth more than $950, which would have elevated the offense to a felony. (See §§ 473 & 476.) During the jury instruction conference, the prosecutor apparently realized that a single $50 bill did not meet that threshold and agreed that Count 2 should instead be a misdemeanor. Bulkin does not challenge this conviction, and we need not address it further.

[4] All undesignated references to rules are to the California Rules of Court.

2.

At sentencing, the trial court struck the strike prior and imposed an upper term sentence of three years on the conspiracy conviction, a one–year stayed sentence on the misdemeanor conviction, and a three–year upper term on the possession of counterfeit currency conviction that it then stayed pursuant to section 654.

Bulkin raises two claims: (1) The conviction in Count 3 for possessing more than $950 in counterfeit currency must be modified to a misdemeanor because there was insufficient evidence to show he possessed in excess of that amount of bogus bills; and (2) The trial court improperly imposed upper term sentences on Counts 1 and 3, and the matter must therefore be remanded for resentencing.

We reject his first contention, but agree with the second.

## FACTS

Because Bulkin raises a sufficiency of the evidence claim, we lay out the relevant underlying facts in some detail, doing so as we must in the light most favorable to the judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) However, because his sufficiency claim relates only to Count 3, we focus our factual summary accordingly. Additional facts germane to his sentencing contentions are found in the discussion below.

In July 2021, Bulkin and his cohort Bacigalupi went into a SaveMart grocery store in the town of Sonora where each attempted to use counterfeit $50 bills to purchase a small amount of goods.

Bulkin went through one cashier's checkout line and handed her a $50 bill to pay for a bag of jerky and some pistachios. The cashier ran the bill through a counterfeit bill "reader," which displayed a red light and "beeped," indicating to her that the bill was counterfeit. Bulkin repeatedly told the cashier to instead check the bill's authenticity by using a pen or flashlight. According to store policy, however, the cashier called her manager for assistance, and the manager ran the bill through the reader again with the same results. The manager told Bulkin that company policy required them to use the store's reader, and they could not accept his $50 bill as payment for his items. The

3.

cashier handed the bill back to Bulkin, who then paid for his items with other cash before leaving the store.

Meanwhile, at the same time, Bacigalupi went through a different checkout line, where he gave the cashier a $50 bill to pay for a bag of ice and some beer. That cashier ran Bacigalupi's $50 bill through a reader, which also displayed a red light and "beeped." The manager was again called over and he ran Bacigalupi's bill through the reader with the same results. The cashier gave the bill back to Bacigalupi, he paid for his items with other cash, and then left the store with Bulkin.

As the two walked toward a car in the parking lot, the manager called police to report that two men had just attempted to use counterfeit money at his store. Police quickly responded and stopped the car at a gas station near the entrance to the grocery store parking lot. Bacigalupi was in the driver's seat and Bulkin was in the front passenger seat.[5]

Both men were searched, as was the car, and a total of 39 counterfeit $50 bills were found. Bacigalupi had 10 on his person. Bulkin had 12, with nine in his wallet and three additional bills secreted inside his cellphone case. Six additional bills were in the center console between the two front seats nestled "directly under" three cell phones.

In the trunk, police found a pair of Nike shoes and inside one shoe were an additional 11 counterfeit $50 bills, "neatly folded in half." The trunk itself was only accessible either by folding down the rear seat or by pushing a release button located to

---

[5] At trial, one of the responding officers was asked if he had attempted to track down the registered owner of the car. He said that he had tried but that it was "still unclear" both as to the car's owner and whether Bacigalupi had the owner's consent to use it. The record is silent as to what the officer "tried" to do in this respect, or why it was "still unclear" even two years later at the 2023 trial.

The officer added that Bacigalupi told him the car belonged "to an aunt of a friend of a roommate of his," or possibly "from one of the three." If the police department made efforts to follow–up and determine who these people were, it is not in the record.

the left of the car's steering wheel. The ignition keys could not be used to open the trunk from the outside and, after police unsuccessfully attempted to do so, Bacigalupi was asked how to open the trunk but he claimed he did not know how.

A Special Agent from the United States Secret Service testified as an expert in counterfeit currency and opined that all of the $50 bills were counterfeit. Moreover, he identified the serial numbers on the bills as the same as "several hundred" other counterfeit bills that had been passed throughout Northern California in "the last couple years."

In the car, police found numerous receipts for cash purchases in or near increments of $50 — as well as receipts for returns associated with those purchases — from hardware and auto parts stores in both Tuolumne County and the Bay Area. As the dates on the receipts got closer to the day of the attempted Sonora grocery store scam, the locations got closer to Tuolumne County. One, in fact, was dated the same day as the pair's arrest. It was for a purchase made at an auto parts store in Calaveras County, made with $200 in cash, and the merchandise was found in the trunk of the car.

Other receipts showed several hundreds of dollars in purchases — from $200 to over $700 — with partial refunds from tool, home improvement, and drug stores in the Bay Area during the week prior to the Sonora grocery store grift. Some of the receipts identified Bacigalupi as the person who had made the purchase and return, but others contained no identifying information. Throughout the interior of the car there were goods matching some of these receipts, several of which were still in their original unopened packaging.

In a monitored jailhouse phone call made the day after their arrest, Bulkin and Bacigalupi each separately spoke with an unidentified female, provided her with their Google account email addresses and passwords, and instructed her to remotely delete everything from their cell phones. Unsurprisingly perhaps, when the Sonora police later sent the phones to be forensically examined, they were returned as having been "wiped."

There is no evidence to suggest whether the police or the prosecution attempted to track down this woman, or with what results.

Bulkin chose not to testify, and the defense presented no evidence.

## DISCUSSION

### I. Sufficiency of the Evidence:

Bulkin first claims his conviction on Count 3 should be reduced to a misdemeanor because there was insufficient evidence to show that he possessed more than the $950 in counterfeit bills necessary to establish a felony offense. We are not persuaded.

#### A. Standard of Review

" 'In reviewing a sufficiency of the evidence claim, the reviewing court's role is a limited one.' " (*People v. Alvarez* (2025) 18 Cal.5th 387, 470 (*Alvarez*); *People v. Flores* (2020) 9 Cal.5th 371, 411 ["The test for evaluating a sufficiency of evidence claim is deferential[.]"].) " ' "[W]e review the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence — that is, evidence which is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780; *People v. Oyler* (2025) 17 Cal.5th 756, 768, fn. 2 [" 'we review in detail the evidence in support of the prosecution's case' [citation] and 'view the evidence in the light most favorable to the judgment below.' "].) " ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the [factfinder] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) The test is " 'whether *any* rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt' " (*Ibid.*, original italics.)

As such, we " 'presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted

simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; cf. *Alvarez, supra,* 18 Cal.5th at p. 478 [it is the jury, not an appellate court that must be convinced of a defendant's guilt].) We "can only reject evidence accepted by the trier of fact when the evidence is inherently improbable and impossible of belief." (*People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268.)

Similarly, our standard of review is the same whether the prosecution relied on circumstantial evidence or direct evidence. (See *People v. Westerfield* (2019) 6 Cal.5th 632, 713.) " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Ibid.*) Relatedly, " '[w]e must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

As a result, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*); *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538 [standard of review for assessing the sufficiency of the evidence "is a highly deferential one"].)

Simply put, Bulkin "bears an enormous burden" to prevail on his sufficiency of the evidence claim. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330).

## B. Legal Background

A person who knowingly possesses counterfeit items with the intent to pass, facilitate, or utter them is guilty of a form of forgery. (§ 475, subd. (a); see § 470, subd. (d) [listing the items to which § 475 applies, including a "bank bill" or "note"].) A "bank bill" includes currency. (*People v. Mutter* (2016) 1 Cal.App.5th 429, 436; see also *People v. Maynarich* (2016) 248 Cal.App.4th 77, 80–81 ["United States currency, issued by the Federal Reserve Bank, qualifies as a bank bill or note."].)

Possession of counterfeit currency is a felony only when the value of the possessed counterfeits collectively exceeds $950; otherwise, the offense is a misdemeanor. (§ 473, subd. (b).) Phrased differently, whether the offense is a felony or a misdemeanor "is determined by the total value of the counterfeit currency possessed by the defendant," not the denomination of the individual bills. (*People v. Aguirre* (2018) 21 Cal.App.5th 429, 434.)

In order to convict Bulkin of a felony in Count 3, the prosecution was required to prove that he: 1) possessed counterfeit bills; (2) knew they were counterfeit; (3) intended to pass them as genuine; (4) did so with an intent to defraud; and (5) that the value of the counterfeit bills he possessed was greater than $950. (See CALCRIM No. 1930.) Bulkin's appeal is based on the fifth element, and he insists that the only thing the prosecution proved here was a misdemeanor because there was insufficient evidence that he possessed more than $950 in counterfeit bills.

To resolve this claim, we must examine the meaning of "possess," both legally and factually, within the context of the circumstances of the case.

To begin, there is no dispute whether Bulkin possessed at least $600 – the nine counterfeit $50 bills found in his wallet and the three $50 bills hidden in his cell phone case. The question then moves to the six $50 bills in the center console of the car and the 11 $50 bills in the trunk. Even assuming that Bulkin possessed the six bills in the center console, this would still bring the total to only $900. Therefore, the decisive factual issue is whether Bulkin possessed the $550 in counterfeit bills found in the trunk. If so, it would bring the total to more than $950, regardless of the bills in the center console. If not, the prosecution failed to prove a felony offense, and the judgment must be modified and the matter remanded for resentencing on a misdemeanor conviction.[6]

---

[6] We assume without deciding that Bulkin did not jointly or constructively possess any of the bills that were found in *Bacigalupi*'s wallet.

### C. Analysis

It is well established that possession may be actual or constructive. (*People v. Wise* (2021) 69 Cal.App.5th 505, 510.) A defendant has actual possession when the prohibited item is in their immediate possession or control, "i.e., when he or she is actually holding or touching it." (*Ibid.*) An example would be Bulkin's 12 $50 bills.

"Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, *or to the joint dominion and control of the accused and another*." (*People v. Williams* (1971) 5 Cal.3d 211, 215 (*Williams*), italics added; cf. *People v. Pena* (1999) 74 Cal.App.4th 1078, 1083–1084 ["while not in his actual possession, [the item] is nonetheless under his dominion and control, either directly *or through others,*" italics added].) An example would be the six counterfeit bills found in the center console.

Consequently, two persons may jointly possess the same items, and it is not necessary for the prosecution to prove exclusive possession of either the prohibited items or exclusive dominion and control of the place where they are found. (*People v. Rushing* (1989) 209 Cal.App.3d 618, 622; see also *People v. Williams* (2009) 170 Cal.App.4th 587, 625 [a conviction is not precluded " 'if the defendant's right to exercise dominion and control over the place where the contraband was located is shared with another.' "].)

Equally, joint possession does not require that the contraband be in actual possession on the person of one of the joint possessors. Therefore, possession may be shared both jointly *and* constructively. For example, "it may have been found in a vehicle in which the joint possessors have been riding, and need not have been in that part of the vehicle in which one of them is seated." (*People v. Cirilli* (1968) 265 Cal.App.2d 607, 612; cf. *People v. Torres* (1950) 98 Cal.App.2d 189, 193 [" [M]arihuana was found on the front seat of the car in which all [three] defendants were riding. The question whether the defendants knowingly had possession of it was a factual question for the [fact–finder] to determine."]; *People v. Villanueva* (1963) 220 Cal.App.2d 443, 450 [exclusive possession of the location where the contraband is

found " 'is not necessary nor is physical possession of the [contraband] of the essence' "].)

Absent admissions or confessions, constructive possession is rarely shown directly. Even so, it "may be established by circumstantial evidence and any reasonable inferences drawn from such evidence." (*Williams, supra*, 5 Cal.3d at p. 215; *People v. Palaschak* (1995) 9 Cal.4th 1236, 1242 [The "essential elements of possession … 'may be established circumstantially.' "].) In the end, "there is no single factor or specific combination of factors which unerringly points to possession…. [T]he question of possession turns on the unique factual circumstances of each case." (*People v. Land* (1994) 30 Cal.App.4th 220, 228.)

An " 'inference of dominion and control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control: his residence [citation], his automobile [citation], or his personal effects [citation].' " (*People v. Busch* (2010) 187 Cal.App.4th 150, 162 [marijuana found in the center console of the *defendant*'s car].) Here, however, it is unclear to whom the car belonged. Whether merely being the driver on the one occasion when the co–conspirators were stopped by police does not *necessarily* imply exclusive dominion and control of the car, and any such inference cannot be "easily made" one way or the other.

It is also true that "standing alone," mere proximity to contraband, or even an opportunity to access it, "is not sufficient evidence of possession." (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417, disapproved on another ground in *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6; see also *People v. Tripp* (2007) 151 Cal.App.4th 951, 956 [" 'Mere proof of opportunity of access to a place where [contraband is] found will not support a finding of unlaw[f]ul possession.' "]; cf. *People v. Zyduck* (1969) 270 Cal.App.2d 334, 335-336 (*Zyduck*) [merely being a passenger in a knowingly stolen car is not enough to show possession].)

Nevertheless, although some additional evidence is essential to establish possession, "the necessary additional circumstances may, in some fact contexts, be rather slight." (*Zyduck, supra,* 270 Cal.App.2d at p. 336.) Moreover, "[t]hough proof of

10.

opportunity of access to a place where [contraband is] found, without more, will not support a finding of unlawful possession, the fact that other persons had access to the premises in which the [contraband] was found does not negat[e] a finding of joint possession and control." (*People v. Roberts* (1964) 228 Cal.App.2d 722, 726.)

Neither Bulkin nor Bacigalupi had actual possession of the bills located in the trunk, so the first question is constructive possession. At the same time, there is no evidence suggesting that either co–conspirator exclusively possessed the bills in the shoe in the trunk, i.e., that the shoes only belonged to one of them.[7] For that matter, there is nothing to suggest that either of them exclusively possessed the car itself. Even though Bacigalupi was driving when the pair was arrested, he offered a ludicrous explanation for how he had obtained the car and it is undisputed that the car was not owned by either of them.[8] Hence, the second question then turns to joint possession.

Bulkin made no statements to police, but both he and Bacigalupi had numerous well–documented counterfeit $50 bills on their persons. In addition, both had almost simultaneously attempted to pass one of those same bogus $50 bills in separate check–out lines at the same grocery store only minutes before police detained them. Finally, when searched, Bulkin had more bills in his immediate possession than Bacigalupi.[9]

---

[7] Police were unable to determine to whom the shoes belonged. However, there is nothing to indicate that they checked to see whether the shoe size matched either Bulkin or Bacigalupi, whether the shoes had been previously worn or just recently purchased, or even whether there was a receipt for them in the car.

[8] Oddly, the People tell us that the car "was registered to Bacigalupi," but their corresponding citations to the record do not even remotely support this claim. Rather, as noted above, the registered owner of the car was "unclear" even at the time of trial, and Bacigalupi's outrageous explanation to the guileless officer about it belonging instead "to an aunt of a friend of a roommate of his" was apparently missed by the People in their briefing. If anything, the unsettled question of the car's true owner militates *against* any conclusive inference that Bacigalupi was in exclusive possession of the car, let alone the trunk and its contents.

[9] Drilling down a bit deeper into the record, we see from People's Exhibit 5 that ten of the 39 bills had serial numbers ending in 7996A. One was in the center console, one was in Bacigalupi's wallet, and one was in Bulkin's wallet. Notably, however, all

11.

In addition to the 11 counterfeits found in the trunk, the entire car was loaded with receipts and merchandise that showed the pair had been working their counterfeit scam together for some time, and not just in Tuolumne County.  Indeed, the fact the jury convicted Bulkin of a conspiracy to do exactly that strongly supports an inference of joint possession, and Bulkin does not contest his conspiracy conviction.

Bulkin maintains his felony possession conviction cannot stand because there are alternative circumstantial inferences that may be drawn from the evidence that point to a lack of joint constructive possession of the 11 bills in the trunk.  Just as his trial counsel argued at trial, he offers us a speculative scenario where Bacigalupi was the mastermind and Bulkin was a mere stooge going along with the plan, and that Bacigalupi had exclusive access, dominion, and control over the 11 bills in the trunk.[10]

_____

three of the bills stashed in Bulkin's cellphone case ended in that same number as did four of the 11 bills found in the trunk.

Nine bills had serial numbers ending in 7737A.  Five were in the trunk, two in Bacigalupi's wallet, one in the center console, but only one in Bulkin's wallet.

The serial number of the bill Bacigalupi attempted to pass at the grocery store ended in 1168A, as did two bills in his wallet, one in the center console, and one in the trunk.  However, Bulkin had none with that number.

The Secret Service agent testified that 115 bills with the 1168A serial number had been passed (and tracked by his agency) since 2019, with the first being in the city of Vallejo.  Most were in Northern California, "a small handful [were] in Southern California, and … seven out of the 115 … were out of state."

It is not unreasonable to infer from the distribution of the serial numbers that the two co–conspirators were jointly divvying up their supply of phony money.

[10] Bulkin relies on *People v. Myles* (1975) 50 Cal.App.3d 423 to support his sufficiency claim, but it is distinguishable.  There the court found insufficient evidence of possession where the defendant, who was a passenger in someone else's car, was one of several people police saw looking into the trunk that contained two recently stolen television sets.  (*Id.* at pp. 426–429.)  However, the defendant in that case did not have 12 stolen television sets in his actual possession or six stolen sets sitting next to him in the passenger seat.  Nor had he personally attempted to try to foist one of the sets off to a grocery store clerk only moments before police detained him.

If Bulkin was the clueless lackey that he would now have us believe, why did he have *more* counterfeit bills on his person than Bacigalupi?  Similarly, why did Bulkin have nine of the ten bills with serial numbers ending in 7996A if we include the one in his wallet, the three bills hidden in his cellphone case, the one in the center console, and four of the 11 bills in the trunk if he did not have joint possession of the counterfeits?

In any event, that is not our task on appeal because it was the jury's task below.  "[W]e review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence."  (*Zamudio, supra,* 43 Cal.4th at p. 357.)  We may not reverse the judgment simply because some circumstances might reasonably be reconciled with a contrary finding.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.)  In a circumstantial evidence case regarding possession such as this, we must accept any logical inferences the jury might have drawn from the circumstantial evidence, because "it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  Simply put, "[w]here the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence."  (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.)

The evidence supports a reasonable inference that the pair were and had been working together as partners to pass counterfeit currency, and while doing so they constructively and jointly possessed counterfeit bills.  More specifically, this inference reasonably includes the 11 bills cached in the shoe in the trunk.

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."  (*Zamudio, supra*, 43 Cal.4th at p. 357.)  Here, substantial evidence supports a reasonable circumstantial inference that Bulkin knowingly possessed — constructively and jointly with Bacigalupi — the eleven counterfeit $50 bills found in the trunk of the car, and that he was fully aware of their counterfeit nature.  Consequently, when joined with the 12 bills found in his immediate possession — and even without including the six

13.

in the center console — the evidence reasonably supports the jury's conclusion that Bulkin possessed more than $950 in counterfeit currency and his felony conviction for doing so must stand.

## II. Sentencing:

Bulkin next contends that the judgment must be reversed and remanded for resentencing because the upper term sentences imposed on Counts 1 and 3 were erroneous for two reasons: (1) Bulkin did not validly waive his right to a trial on the prosecution's alleged factors in aggravation; and (2) Bulkin's trial rights notwithstanding, the court's reliance on Bulkin's prior "criminal history," to impose aggravated terms was prejudicial error. We agree with the second claim, and therefore need not address the first. Any trial right issues may be resolved in the first instance upon remand.

### A. Additional Background

The People's pleadings claimed that Bulkin had previously suffered a first–degree burglary conviction out of Contra Costa County in 2006, which was alleged as a serious and/or violent felony and a strike under sections 667 and 1170.12. They also alleged Bulkin was ineligible for probation because he had suffered two or more prior felony convictions within the meaning of section 1203, subdivision (e)(4). In support of this allegation, the pleadings listed ten convictions that dated from 2001 to 2021.

Lastly, pursuant to rule 4.421, the pleadings also alleged five sentencing factors in aggravation: (1) "The manner in which the crime was carried out indicates planning, sophistication, or professionalism" (rule 4.421(a)(8)); (2) "The defendant's prior convictions as an adult are numerous or of increasing seriousness" (rule 4.421(b)(2)); (3) The defendant has served a prior prison term …" (rule 4.421(b)(3)); (4) "The defendant was on probation … or parole when the crime was committed" (rule 4.421(b)(4)); and (5) "The defendant's prior performance on probation … or parole was unsatisfactory" (rule 4.421(b)(5)).

During the jury instruction conference, Bulkin admitted that he had suffered the 2006 burglary conviction:

14.

"[The Court]: Mr. Bulkin, you have a right to have a trial on the issue of your prior *convictions*, and that trial could be before the jury or before a judge. Your attorney tells me that you have decided to simply admit *them* and not have a trial on that issue. Is that correct? [Italics added.]

"[Bulkin]: Yes, sir.

"[The Court]: Have you had enough time to talk to your lawyer about doing that?

"[Bulkin]: Yeah, we have.

"[The Court]: All right. Do you admit that you had a violation of Penal Code Section 459 for which a judgment was entered on July 18, 2006, in Contra Costa County Superior Court, Case Number 050604595?

"[Bulkin]: Yes, sir."

To be clear, Bulkin did not admit "prior convictions;" he admitted only one. The ten convictions alleged in support of the no–probation allegation were not addressed. Moreover, nor were the rule 4.421 aggravated sentencing factors the prosecution had alleged. Simply put, Bulkin did not clearly waive his right to a trial on any of those allegations, and he did not admit them.

After conviction, at the April 2023 sentencing hearing the first order of business was Bulkin's post–trial motion to strike the prior strike conviction under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. No evidence was produced about the nature or circumstances of the prior itself, or even the sentence imposed, and the arguments for and against the motion to strike mainly involved balancing the fact that the prior was 17 years old against Bulkin's additional (but unproven) criminal record.[11]

More specifically, while considering the motion the parties and the court discussed all of Bulkin's alleged criminal history, both from before and after the 2006 conviction. However, that "history" was unproven and was based only on the probation officer's

---

[11] In his opposition to Bulkin's motion to strike the strike, the prosecutor admitted he had no "information regarding the nature and/or circumstances" of the prior burglary conviction.

presentencing report and the prosecutor's charging allegations.[12]  In the end, after much discussion, the court struck the strike.

Moving on to sentencing, the court began by noting the probation officer had recommended aggravated terms for Counts 1 and 3.  The court asked the prosecutor, "What aggravating circumstances were proven beyond a reasonable doubt in this case?" He replied, "None," and claimed that the rule 4.421(b) "factors don't need to be proven; don't need to be pled, don't need to be proven."  When asked what he meant by the 4.421(b) factors, the prosecutor said he meant the defendant's "criminal history."[13]

The prosecutor insisted that Bulkin's "criminal history" warranted imposition of the upper term because Bulkin had engaged in a continuous course of criminal conduct since the early 2000's, with the only break occurring while he was serving a nine–year prison sentence, in addition to the 2006 burglary conviction.  He also claimed that Bulkin was on parole at the time of the current offense but ultimately conceded that this had not been proven.  In reality, nor had a nine–year intervening prison term, let alone a continuous course of criminal conduct throughout the early 2000's as the prosecutor had proclaimed.

When the court asked the prosecutor what, other than the admitted 2006 burglary prior, constituted Bulkin's "criminal history," he cryptically replied: "Well [my] argument would be redundant.  There's a lot of it.  The only break in time is explained by a nine–year prison sentence.  So based on that, it's continuing criminal conduct going

---

[12] The deputy probation officer who had written the report was not present in court.  The officer who was in court contacted her by phone to obtain some of the details from Bulkin's "RAP sheet just to confirm," i.e., from unsworn triple hearsay supposedly originating from an apparently unauthenticated CLETS criminal history "printout" that was never presented in court nor attached as a part of the probation report.  Indeed, the prosecutor told the court he did not even have his own copy.

[13] It is unclear why the prosecutor had alleged them in his charging document if he did not need to plead them.  Moreover, rule 4.421(b) actually refers to "[f]actors relating to the defendant," and not all of them involve a defendant's "criminal history." (See rule 4.421(b)(1) ["The defendant has engaged in violent conduct that indicates a serious danger to society'"].)

back to the beginning of the century. This is great[er] or more than usual planning and sophistication."[14] To reiterate, however, none of this "continuing criminal conduct" had been admitted by Bulkin or proven, nor was there anything to support the prosecutor's hyperbolic reference to the "beginning of the century," or to the "more than usual planning and sophistication."

The court then asked the prosecutor, "So … the only aggravating circumstances that were proven beyond a reasonable doubt is the criminal history, correct?" In a non–responsive waffle, the prosecutor replied, "That's my understanding." The court then pointedly asked, "Is it also your understanding that those *are* the only *ones* that the court can consider?" to which the prosecutor admitted they were. (Italics added.) Plural.

The court then concluded by stating it was "going to impose the aggravated sentence based on [Bulkin's] *criminal history that was proven at trial*." (Italics added.) Therein lies the problem now before us.

Based on our review of the entire sentencing hearing, including the discussion of whether to strike the strike prior for additional context, we cannot reasonably conclude as the People now suggest that the trial court imposed the aggravated terms on Counts 1 and 3 solely based on Bulkin's single 2006 burglary conviction. In other words, we cannot conclude beyond a reasonable doubt that the court's use of the term "criminal history" in its ruling did not include *all* of Bulkin's criminal past, almost all of which comprised the unproven aspects of Bulkin's background that the prosecutor insisted he did not need to plead or prove.

### B. Legal Background

"In general, we review a trial court's sentencing decisions for abuse of discretion. [Citation.] 'An abuse of discretion is found where the court "relies upon circumstances

---

[14] Apparently, the prosecutor was referring to the "manner in which the crime was carried out indicates planning, sophistication, or professionalism" factor of rule 4.421(a)(8), which was also alleged in the pleadings, but was similarly neither proven at trial nor admitted by Bulkin.

that are not relevant to the decision or that otherwise constitute an improper basis for decision." ' " (*People v. Gonzalez* (2024) 107 Cal.App.5th 312, 323.)

In 2022, section 1170, subdivision (b) was "amended to prohibit imposition of an upper term sentence unless aggravating circumstances justify that term and the facts underlying any such circumstance, other than a prior conviction, 'have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.' " (*People v. Lynch* (2024) 16 Cal.5th 730, 742 (*Lynch*).)

Although decided after the sentencing in this case, the *Lynch* court clarified section 1170, subdivision (b)'s scope by first stating that "allegations of prior convictions may be tried by the court alone and proven by certified records of conviction." (*Lynch, supra,* 16 Cal.5th at p. 742.) Thus, "the court 'may consider the defendant's prior convictions in determining sentencing *based on a certified record of conviction* without submitting the prior convictions to a jury.' " (*Id.* at p. 748*, italics added; see *id.* at p. 757 [Except for "*properly proven* prior convictions or a defense stipulation, a jury finding is now required for all facts actually relied on to impose an upper term" (italics added)].)

Soon after *Lynch* was decided*, in *Erlinger v. United States* (2024) 602 U.S. 821 (*Erlinger*), the high court rejected an argument that the jury trial exception to prior convictions "permits a judge to find perhaps *any fact* related to a defendant's past offenses, including whether he committed them on different occasions" within the meaning of the federal sentencing statute at issue. (*Id.* at p. 837, italics added.) Instead, "a judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.' " (*Id.* at p. 838, quoting *Mathis v. United States* (2016) 579 U.S. 500, 511–512.)

In doing so, the court reaffirmed the basic rationale of *Apprendi v. New Jersey* (2000) 530 U.S. 466 and rejected the arguments made by the dissent and amicus curiae that, historically, "[w]hen exercising their sentencing authority, judges were also presumed to have the power to find and consider nearly any fact deemed relevant to the penalty." (See *Erlinger, supra,* 602 U.S. at p. 875 (dis. opn. of Jackson, J.); see *id.* at p. 843 [summarizing and rejecting amicus curiae's argument that "the Fifth and Sixth

Amendments' original meaning and 'deep' common–law traditions authorize judges at sentencing to find all manner of facts about an offender's past crimes"].)

As a result, while sentencing procedures and practices do retain some flexibility with which to experiment, such experiments "must remain within the Fifth and Sixth Amendments' guardrails." (*Erlinger, supra,* 602 U.S. at p. 832.) The Supreme Court reminded that in "a variety of other recent sentencing innovations" (*id.* at p. 833), it had always "come to the same conclusion in one decision after another." (*Id.* at p. 843, and cases cited.) As a result, "[v]irtually 'any fact' that ' "increase[s] the prescribed range of penalties to which a criminal defendant is exposed" ' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." (*Erlinger, supra,* 602 U.S. at p. 834.)

**C. Analysis**

Although Bulkin admitted his 2006 burglary conviction, nothing about his other criminal history was admitted by Bulkin, properly proven by certified records of conviction, or otherwise supported by competent evidence. Instead, the court relied exclusively on the probation officer's report, the pleadings, and the arguments of counsel in making its decision. Nothing about Bulkin's *other* "criminal history" was proven "at trial." The only thing properly before the court was Bulkin's admission to the 2006 burglary conviction, which was cursorily given during a break in trial, with no underlying facts or surrounding circumstances, and which was in fact struck by the trial court for sentencing purposes based at least in part due to its remoteness in time.

More importantly, in its ruling the trial court did not explain what it meant by "criminal history" when it imposed upper term sentences on Count 1 and 3: Was it only the single 2006 prior strike conviction; did it include the non–proven prior convictions taken from the probation report and the pleadings; did it embrace the circumstances behind those other convictions, including that some had allegedly occurred while Bulkin was in prison for nine years, or that they were "continuous," as the prosecutor claimed; or even that Bulkin was supposedly on parole at the time of the instant offense, another fact that was merely alleged but unproven? Simply put, from this record, we cannot

19.

determine what it was about Bulkin's "criminal history" that formed the court's basis for finding the necessary aggravating circumstances for upper term sentences.

The *Lynch* court explained that "nothing in section 1170[, subdivision] (b)(2) prohibits the court from imposing an upper term sentence based on a single, properly proven aggravating circumstance *if*, in the court's discretion, *that circumstance alone justifies* a sentence exceeding the middle term. . . . But under the current statute, the court may do so 'only' if it determines 'in its sound discretion,' that a single aggravating circumstance 'justif[ies]' the upper term.' " (*Lynch, supra*, 16 Cal.5th at p. 764, original italics.) Notably, however, the *Lynch* court specified a single, properly proven aggravating *circumstance*, not a single, properly proven prior *conviction*.[15]

Here, the trial court made no specific determination regarding any of the prosecutor's other alleged factors in aggravation and instead stated only that it was relying upon Bulkin's "criminal history as proven at trial." Even so, the only criminal history *proven at trial* was a single 17–year–old burglary conviction, which involved unknown underlying facts and circumstances.[16]

Since *Erlinger*, the California Supreme Court has gone further to make it clear that *Erlinger* requires "that *any fact, beyond the bare fact of a prior conviction*, that exposes a defendant to harsher punishment, must be found by a jury beyond a reasonable doubt,

---

[15] The bare fact of a *single* prior conviction as an aggravating factor is not found either in the Penal Code or the Rules of Court.

[16] "The court may only choose an upper term when (1) there are circumstances in aggravation of the crime that justify the imposition of an upper term, and (2) the facts underlying those circumstances have been (i) stipulated to by the defendant, (ii) found true beyond a reasonable doubt at trial by a jury, or (iii) found true beyond a reasonable doubt by the judge in a court trial." (Rule 4.420(b).) "[T]he court may consider the fact of the defendant's prior convictions based on a certified record of conviction without it having been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial." (Rule 4.420(c).) Rule 4.420 has not been amended since 2022, so even in 2023 Bulkin's 2006 prior was the only thing properly available to the trial court for its sentencing considerations — even before *Lynch* and *Erlinger* were decided in 2024.

unless the defendant stipulates to its truth or waives a jury trial.  This jury trial guarantee retains its vitality even if the inquiry is ' " ' straightforward.' " ' [Citation.]  'There is no efficiency exception to the Fifth and Sixth Amendments.' [Citation.]  Only when aggravating facts have been proven as the Constitution requires may the court then rely on them to conclude, in its discretion, that those facts justify an upper term." (*People v. Wiley* (2025) 17 Cal.5th 1069, 1083–1084 (*Wiley*), italics added [absent an admission or a jury trial waiver, a trial court cannot determine whether a defendant's prior convictions were of increasing seriousness or that his probation or parole performance was poor].)

The *Wiley* court further held that section 1170, subdivision (b)(3)'s statutory exception to a jury trial right for prior convictions — which authorizes a court to consider the defendant's prior convictions in determining sentencing based on certified records of conviction without submitting the prior convictions to a jury — was still valid, but in doing so a court must nevertheless still "comport with federal constitutional requirements, which *Erlinger* has now clarified." (*Wiley, supra,* 17 Cal.5th at p. 1085.)

Here, the trial court did not have the guidance of *Lynch, Erlinger,* and *Wiley,* and we cannot fault its ultimate ruling, ambiguous as it may have been.  Be that as it may, "[t]he proper procedure for adjudicating such aggravating facts is as follows:  Defendants may assert the right to a jury trial, may waive jury in favor of a court trial, or may waive trial altogether.  Subject to the standard rules of evidence both parties may stipulate to the admission of probation reports or other evidence bearing on a defendant's social and educational history, as well as other information relevant to sentencing, including criminal history.  The burden is on the People to prove beyond a reasonable doubt the facts relied on to justify an upper term sentence.  If those facts are properly proven, the court may take them into account and exercise its discretion under section 1170[, subdivision] (b) to determine what sentence to impose, keeping in mind the statutory limits on upward departures from the midterm and the requirement for stating its reasons on the record." (*Wiley, supra,* 17 Cal.5th at p. 1086.)

Phrased differently, "a defendant is entitled to a jury trial on all aggravating facts, other than the *bare fact* of a prior conviction and its elements, that expose the defendant

21.

to imposition of a sentence more serious than the statutorily provided midterm." (*Wiley, supra*, 17 Cal.5th at p. 1086, fn. omitted, italics added.)  Thus, for example, *Erlinger* now "requires that a jury determine whether the particular details of a defendant's criminal history establish an unsatisfactory probation performance or demonstrate convictions of increasing seriousness, before a trial court can rely on those facts to justify an upper term sentence." (*Wiley, supra,* 17 Cal.5th at p. 1078; cf. *Erlinger, supra*, 602 U.S. at p. 835 ["Presented with evidence about the times, locations, purpose, and character of those [prior] crimes, a jury might have concluded that some or all occurred on different occasions.  Or it might not have done so.  All we can say for certain is that the sentencing court erred in taking that decision from a jury of [the defendant's] peers."].)

The People candidly admit that if the "trial court relied upon any additional prior convictions [from the probation officer's report], which were not admitted by [Bulkin], proved beyond a reasonable doubt, or established through certified records of conviction, such reliance would amount to constitutional error[.]"[17]  Similarly, the People also correctly concede that to the extent the trial court relied on the probation officer's report, a remand for resentencing is required because the probation officer's report "is not a certified record of conviction nor is it admissible evidence to prove any circumstance in aggravation." (Cf. *People v. Orloff* (2016) 2 Cal.App.5th 947, 950, fn. 2 [a probation report cannot be used in a substantial evidence analysis because we are limited to the actual evidence presented].)

Nonetheless, the People argue that, *Erlinger* and *Lynch* notwithstanding, Bulkin's admission to the 2006 burglary conviction "standing alone" in its bare, unrevealed details was sufficient to justify an aggravated term sentence and therefore a remand for resentencing is not required. They base this claim on the fact that "the California Rules of Court are advisory, and 'a trial court not limited to the aggravating circumstances listed

---

[17] "When a defendant is deprived of a jury trial on aggravating facts used to justify imposition of an upper term sentence, the reviewing court must apply the *Chapman* standard of review." (*Wiley, supra,* 17 Cal.5th at p. 1087; see also *Lynch, supra*, 16 Cal.5th at pp. 742–743; *Chapman v. California* (1967) 386 U.S. 18.)

in the rules,' " relying on *People v. Black* (2007) 41 Cal.4th 799, 817 (*Black*) and rule 4.408(a) ["[t]he listing of factors in these rules for making discretionary sentencing decisions is not exhaustive and does not prohibit a trial judge from using additional criteria reasonably related to the decision being made"].)

However, after the People's response brief was filed, *Black* was overruled in *Wiley, supra,* 17 Cal.5th at p. 1076, where the court found that *Erlinger* required that the prior conviction exception to a jury trial right is much narrower than had been previously held in cases such as *Black*, and that "the federal Constitution's jury trial right requires that a jury determine whether the particular details of a defendant's criminal history establish an unsatisfactory probation performance or demonstrate convictions of increasing seriousness, before a trial court can rely on those facts to justify an upper term sentence." (*Wiley, supra,* 17 Cal.5th at p. 1078.)

Furthermore, "a Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, *even if some other aggravating facts relied on have been properly established*. The violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements. If the reviewing court cannot so determine, applying the *Chapman* standard of review, the defendant is entitled to a remand for resentencing." (*Lynch, supra,* 16 Cal.5th at p. 768, italics added; see *People v. Gonzalez* (2024) 107 Cal.App.5th 312, 331–333.) This is exactly what happened here.

Also defeating the People's argument is *Lovelace v. Superior Court* (2025) 108 Cal.App.5th 1081 (*Lovelace*). There, the court invalidated on constitutional grounds rule 4.421(c)'s catch–all residual clause that included as permissible circumstances in aggravation "[a]ny other factors … [that] reasonably relate to the defendant or the circumstances under which the crime was committed." (*Id.* at p. 1105.) Although it was not an issue in *Lovelace*, rule 4.408(a) is similar enough to rule 4.421(c) that we must question whether it too is on equally shaky constitutional foundations. Furthermore,

23.

rule 4.408(a) requires that "[a]ny such additional criteria must be stated on the record by the sentencing judge," and here the court's sole criterion for aggravation was an ambiguous "criminal history" non–factor, which is not in the Penal Code or the Rules of Court, and which was not further explained by the court.

The sentencing hearing was focused on Bulkin's "criminal history," where the court and both parties relied on the triple hearsay–based probation report that purported to describe Bulkin's entire past criminal record, including his behavior while in prison, and the fact he was on parole at the time of the current offenses. None of these aspects of Bulkin's past had been proven. Indeed, the prosecutor failed to produce a shred of evidence to support any inferences to be drawn from Bulkin's other "criminal history," apparently because he believed he had no need to.

The trial court stated that it was Bulkin's "criminal history" it had considered in deciding to impose upper term sentences, but it did not make clear just what about this history it was relying upon. (Cf. § 1170, subd. (b)(5) ["The court shall set forth on the record the facts and reasons for choosing the sentence imposed."].) Further complicating matters, we are reviewing the trial court's decision as presented to us in its pre–*Lynch/Erlinger/Wiley* form, and we cannot and may not speculate on what the trial court *would or could* have done within its sentencing discretion had it been guided by these subsequent cases — which now also includes *Lovelace*. At the same time, it is the ambiguity of this criminal history "factor" that also mandates a remand for further elucidation and/or trial because we cannot conclude beyond a reasonable doubt whether the trial court's sentencing decision here was based *only* on the single bare fact that Bulkin had admitted and waived trial on a hazy 2006 burglary conviction and nothing else.

In the end, because we cannot be certain either what the trial court *did* here, or what it *would* have done if its sentencing decision had been circumscribed solely to the bare fact of Bulkin's single 2006 prior conviction, we must remand. Just as we may "not reverse orders based upon speculation," and instead may only "opine on [the court's]

actual ruling" (*People v. Mills* (2025) 114 Cal.App.5th 270, 272, we equally may not affirm them.

Based on the uncertain record we have, and the subsequent changes to the sentencing laws, we must therefore vacate the sentences on Count 1 and 3, and remand the case for resentencing in light of and in compliance with *Erlinger*, *Wiley*, *Lynch,* and *Lovelace*. (*Lynch, supra*, 16 Cal.5th at p. 776 [the remedy for a failure of proof when the aggravating factors were not tried, either by the court or a jury, is to remand and give the People an opportunity to do so].)

## DISPOSITION

The judgment is affirmed in part and reversed in part.

The convictions are affirmed. The sentence is reversed and vacated, and the matter is remanded to the trial court for proceedings consistent with this opinion. Afterwards, the superior court clerk is directed to prepare an amended abstract of judgment and serve it on the Department of Corrections and Rehabilitation and all necessary entities.

SNAUFFER, J.

WE CONCUR:

HILL, P. J.

GUERRA, J.*

---

*Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25.