Filed 2/26/26  P. v. Acosta CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D086916 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2203105) |
| MARLON ACOSTA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jason Armand, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

Marlon Acosta appeals from a judgment after a jury found him guilty of sexual penetration by force against J.L. (Pen. Code,[1] § 289), attempted sodomy of J.L. (§§ 664, 286), kidnapping of J.L. to commit robbery, rape, oral copulation, sodomy (§ 209), sexual intercourse by force against L.C. (§ 261), and assault of L.C. to commit rape, sodomy, oral copulation during a first-degree burglary (§ 220). The court also found true multiple aggravating factors. Acosta contends that: (1) there was insufficient evidence to support his convictions related to J.L.; (2) the trial court erred in limiting his impeachment of a witness; (3) the trial court erred in admitting evidence of an uncharged act; and (4) the prosecutors committed misconduct. We disagree with Acosta's contentions and affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At trial, the People presented evidence from two named victims, J.L. and L.C., and a third woman, A.C., who testified to uncharged conduct. They also called expert witnesses to testify regarding relevant DNA evidence.

### 1. *J.L.: Counts 1, 2, and 3*

J.L. went for a run in the early morning hours of June 16, 2010. While on her run, she passed two men. One of them wore a black hooded sweatshirt with the hood over his head. J.L. described the other as "a short person, dark skin, and he was wearing a white and black striped shirt, and dark pants."

Shortly after passing the men, J.L. felt someone grab her from behind and begin choking her, telling her he had a knife and a gun. She observed that his sleeve was a thick black sweatshirt. J.L. lost consciousness and came to near a trash bin. Her assailant kept one hand around her neck and tried to touch under her clothing with the other. He began to pull at her pants, continuing to apply pressure to her neck. J.L. bargained with her

---

[1] Further undesignated statutory references are to the Penal Code.

2

assailant for her safety, offering to lower her pants if he would let her breathe. The assailant took J.L.'s hand and placed it on his penis, moving it up and down, before attempting to penetrate J.L.'s anus digitally and with his penis. J.L.'s assailant also touched her vaginal area, and she could not recall if he digitally penetrated her.

J.L. never saw her assailant's face, but he told her not to scream or yell out—that if she "were to do something, he was going to kill [her]." She believed, from "the manner in which the person spoke," her assailant was African-American, but recalled him speaking Spanish. When she heard "the jingling of keys," she screamed out for help. In response, the assailant applied more pressure to her neck. As the person with the keys appeared to get closer, the assailant fled.

J.L. sought immediate assistance, which included law enforcement taking her for a forensic sexual assault exam. She reported to her nurse that she believed her assailant was "either Hispanic or African-American." As part of the exam, swabs of J.L.'s vulva, perianal area, hands, cheek and neck were collected and retained for DNA testing. California Department of Justice criminalists developed partial DNA profiles from the samples. A portion of those partial profiles returned matches with Acosta's DNA profile and ruled out another assailant, except for a match to that other person's DNA profile on J.L.'s neck swab.

2. *A.C.: Uncharged Acts*

Although Acosta was not charged for offenses involving A.C., she testified to acts he allegedly committed in 2012. Before her testimony, the court admonished the jury that they could only consider the evidence if the People "proved by a preponderance of the evidence that [Acosta], in fact, committed the uncharged offense." If the jury decided Acosta committed the

3

uncharged offense, the court told them that they could, but were not required to, conclude that Acosta was disposed or inclined to commit the charged sexual offenses. Finally, the court explained that if the jury decided Acosta *did* commit the uncharged offense it was not sufficient to prove he committed the charged offenses.

In June 2012, A.C. attended a party at Acosta's home. While at the party, A.C., then a minor, consumed alcohol and blacked out. She awoke to Acosta carrying her to a tool shed and again blacked out. When she next came to, Acosta was sodomizing her. Although A.C. reported the assault, charges were not filed.-

3.      *L.C.: Counts 4 and 5*

L.C. testified that in June 2014, she slept on a sofa in her family's garage. On the night of July 16, 2014, Acosta—a neighbor and former romantic partner—messaged L.C., asking if he could come over. L.C. declined and went to bed. L.C. later awoke to Acosta vaginally penetrating her, and she looked over her shoulder, identifying him as her assailant. L.C. told Acosta to stop and to leave. Although he initially ignored L.C.'s plea, she testified that he eventually stopped and inquired whether L.C. was mad at him. In the days that followed, L.C. told Acosta they could not be friends anymore. Acosta indicated that he understood and apologized.

## II. DISCUSSION

1.      *Substantial Evidence Supported the Conviction for Counts 1, 2, and 3 Related to J.L.*

Where a defendant challenges the sufficiency of the evidence supporting a conviction, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We

4

presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*Ibid.*) Reversal for insufficient evidence is warranted only when it appears that under no hypothesis whatsoever is there sufficient evidence to support a jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction, unless that testimony is physically impossibly or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Acosta seeks to classify the series of partial DNA matches as insufficient evidence, describing each of them as failing to rise to the same level of DNA certainty as the match in *People v. Xiong* (2013) 215 Cal.App.4th 1259. Indeed, Acosta equates his partial DNA match across four samples to a single partial DNA match with a different man. This argument fails to account for the fact that three of the samples excluded the alternate perpetrator. Further, J.L. testified extensively as to where her assailant touched her, describing him squeezing her neck, touching her body, and pulling on her pants. The partial DNA profiles developed from those swabbed locations included Acosta's DNA profile in their results as the largest contributor of male DNA, corroborating J.L.'s testimony as to what happened to her. The jury heard extensive expert testimony on how the DNA was collected, processed, and the results of their tests—each of which included Acosta. In making their findings of guilt, it is evident that the jury rejected the argument that it was not Acosta's DNA on J.L.

Acosta, who is Hispanic, attempts to make much of J.L.'s initial assertion that based on the way he spoke, her assailant could have been African American. This argument ignores the fact that J.L. told officers and medical professionals that her assailant may also have been Hispanic.

5

Although J.L. did not see her attacker's face, her description was not inconsistent with Acosta and did not exclude him in the way he now maintains. J.L.'s testimony as to what happened to her on the night of her assault are consistent with the DNA results including Acosta as the perpetrator.

On this record, we conclude ample evidence supports the jury's findings of guilt as to Charges 1, 2, and 3.

2. *The Trial Court Did Not Abuse Its Discretion When It Excluded Evidence of A.C.'s Juvenile Arrest as Unduly Prejudicial*

a. Additional Factual Background

Acosta sought to introduce evidence regarding a single incident A.C. committed at 15 years old. Specifically, A.C. is alleged to have kicked a loss prevention officer during the commission of an *Estes* robbery,[2] during which A.C. and an associate attempted to take alcohol but were unsuccessful. Acosta argued that the *Estes* robbery demonstrated A.C.'s moral turpitude, although it was a single incident that occurred more than a decade before trial. During argument, defense counsel referenced another alleged incident in which A.C. was intoxicated at school and required medical treatment. Counsel asserted that these ties to alcohol were relevant for impeachment purposes as to A.C.'s intoxication on the night Acosta is alleged to have sexually assaulted her. He advanced a theory that A.C. was blackout drunk and therefore lying about Acosta's assault.

The court determined the *Estes* robbery did not survive an Evidence Code section 352 analysis balancing the probative value against prejudice.

---

[2] *People v. Estes* (1983) 147 Cal.App.3d 23. "The typical case starts with a shoplifting and turns into a robbery when the thief is confronted by a [loss prevention officer], and the thief assaults the [loss prevention officer] in an attempt to get away." (*People v. Robins* (2020) 44 Cal.App.5th 413, 419.)

6

Assaulting a loss prevention officer while attempting to take alcohol is not similar to making allegations of rape, prompting the court to find that the incident was not probative. However, the court permitted Acosta to ask questions that might implicate the school alcohol incident for impeachment purposes. A.C. testified the night of her assault was the only time she blacked out while drinking and affirmed it was not possible that she drank so much that the assault did not happen.

b. Guiding Principles and Analysis

We review the trial court's exclusion of A.C.'s prior arrest for an abuse of discretion. "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion [citations]." (*People v. Clark* (2011) 52 Cal.4th 856, 932 (*Clark*).) It is the defendant's burden to show " ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.) Acosta provides no persuasive reason for us to reverse the trial court's ruling in this case.

Acosta correctly observes that robbery is a crime of moral turpitude (*People v. Brown* (1985) 169 Cal.App.3d 800, 806), and that a witness may be impeached with evidence of prior conduct involving moral turpitude. (*Clark, supra*, 52 Cal.4th at p. 931.) However, the court must balance the probative value of the evidence against the danger of undue prejudice, confusing the issues, or misleading the jury. (Evid. Code, § 352.)

Although A.C.'s *Estes* robbery occurred close in time to Acosta's uncharged conduct, assaulting a loss prevention officer while attempting to

7

steal alcohol is markedly different than potentially lying about rape. Defense counsel's argument made clear that his primary focus in introducing the evidence was not that someone arrested for robbery is a less credible witness, but rather that A.C. had a problem with alcohol. The thrust of counsel's argument was that A.C. had a problem with alcohol that culminated in blacking out at the party and lying about her assault. Notably, the incident with which Acosta sought to impeach A.C.'s credibility did not involve any false report of assault, sexual or otherwise. In fact, A.C. accepted responsibility for her actions following her arrest. Further, the trial was more than a decade after A.C.'s arrest for the *Estes* robbery and she did not have additional arrests in the intervening years. A trial court might reasonably conclude that the incident was too remote to be relevant to her credibility at trial. (See *People v. Beagle* (1972) 6 Cal.3d 441, 453.)

On this record, we cannot say that the trial court acted arbitrarily or exceeded the bounds of reason in finding that the prejudicial potential outweighed any possible probative value of A.C.'s arrest.

3.  *The Trial Court Did Not Abuse Its Discretion in Admitting A.C.'s Testimony*

Character evidence is generally inadmissible to prove a defendant's conduct on a specified occasion. (Evid. Code, § 1101, subds. (a), (b).) However, Evidence Code section 1108 "is an exception to the general prohibition against admitting character evidence to prove criminal disposition or propensity." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 352.) When a defendant is accused of a sexual offense, the exception allows the People to introduce evidence of the defendant's commission of uncharged sexual offenses, subject to Evidence Code section 352. (Evid. Code, § 1108, subd. (a).) The Legislature enacted this statute because "evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions

8

it is presumed admissible without regard to the limitations of Evidence Code section 1101." (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 405.)

In determining whether to admit such propensity evidence under Evidence Code section 1108, a trial court weighs:  "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g. whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)  When the " 'probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury,' " then the court may exclude the propensity evidence under Evidence Code section 352. (*People v. Erksine* (2019) 7 Cal.5th 279, 296.)  " 'This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.' " (*People v. Falsetta* (1999) 21 Cal.4th 903, 917–918 (*Falsetta*).)  We will not disturb that ruling on appeal absent a showing that the court exercised its discretion in an "arbitrary, capricious, or patently absurd manner." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

Acosta alleges that A.C.'s testimony was neither probative nor reliable, and should have been excluded under Evidence Code section 352.

It is undeniable that the uncharged conduct by Acosta against A.C. was similar to the charged conduct against J.L., namely secreting them away for nonconsensual sexual contact. A.C. testified that while she was in and out of consciousness, Acosta carried her to a shed and sodomized her without her consent. Her testimony was similar to J.L., who testified that Acosta moved her to a private location behind a dumpster, and attempted to sodomize her without her consent. Further, it was not dissimilar to L.C.'s testimony that Acosta—a former romantic partner—entered her living space without her consent and began having sex with her while she was sleeping and unable to consent. Moreover, the uncharged conduct occurred during the same general time frame as the charged conduct.

A.C. was a minor at the time of Acosta's uncharged conduct, while both J.L. and L.C. were adults at the time the charged conduct occurred. When the court attempted to sanitize that detail, defense counsel made a strategic decision to decline that protection. Although A.C. was younger, it was not emphasized during the trial. Nor did A.C.'s testimony consume significant trial time.

We reject any argument from Acosta that the evidence of uncharged conduct confused, distracted, or misled the jury, or that they might seek to punish him for the uncharged conduct. The jury was specifically instructed under CALCRIM No. 1191A that, even if it found that Acosta committed the uncharged sexual conduct, "that conclusion is only one factor to consider along with all the other evidence"; that such conduct "is not sufficient by itself to prove that the defendant is guilty" of the charged conduct, and that the "People must still prove each charge beyond a reasonable doubt."

With respect to the prior sexual offense evidence instruction, our Supreme Court has stated, "This instruction will help assure that the

10

defendant will not be convicted of the charged offense merely because the evidence of his other offenses indicates he is a 'bad person' with a criminal disposition." (*Falsetta, supra*, 21 Cal.4th at p. 920.) The jury is presumed to have followed the instruction absent "any indication it was unwilling or unable to do so." (*People v. Letner and Tabin* (2010) 50 Cal.4th 99, 196.)

To the extent Acosta invites us to reweigh the evidence or otherwise evaluate A.C.'s credibility in the name reliability, we reject the notion that our court is in a position to do so. " 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

We therefore conclude there is no evidence the trial court abused its discretion in permitting A.C.'s testimony as to Acosta's uncharged conduct.

4.      *The Prosecutor's Statements Do Not Rise to the Level of Misconduct.*

Acosta asserts that the People misstated the DNA evidence and misstated and shifted the burden of proof. These, he asserts, rise to the level of prosecutorial misconduct and merit reversal due to an asserted violation of his due process rights. Acosta uses the term "misconduct" which " 'is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667 (*Centeno*).)

To succeed on appeal, Acosta "must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno,*

11

*supra*, 60 Cal.4th at p. 667.)  If, when viewed in this context, the challenged comments " 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)  Applying these principles, we do not find the prosecutor's statements to be error.

### a.  DNA Evidence

Acosta asserts the prosecutor misstated the DNA testing standards during closing.  Defense counsel argued in closing that the DNA evidence against Acosta was "not that strong" and implied that a 17 loci profile investigators utilized was incomplete.  To address that assertion during rebuttal closing argument, the prosecutor described a specific test run by investigators using 17 loci markers as "completely match[ing]" Acosta's profile.  Consistent with that description, the criminalists testified that the Department of Justice test in question only evaluated 17 loci on the Y chromosome.  All 17 loci utilized in the test matched Acosta's DNA profile.  Thus, the prosecutor's argument, which summarized these DNA tests and results, was not inaccurate to the testimony that came in at trial.

### b.  Burden of Proof

Finally, Acosta contends the People impermissibly shifted the burden of proof to the defense and intimated that the defense had to prove his innocence.  He asserts that the comments the prosecutor made during closing created an impression that he was required to prove that A.C. and L.C. lied.  Contrary to his arguments, the prosecutor did not improperly diminish or shift the People's burden of proof.

In support of his argument, Acosta points to a sustained objection to the statement the prosecutor made during closing.  For his part, during closing, defense counsel argued that A.C. and L.C. fabricated their testimony.

In response, the prosecutor stated that finding Acosta not guilty required the jury to believe A.C. and L.C. lied when they identified him as their assailant or that there was some conspiracy against him.  The court reminded the jury "that the comments of the attorneys, both Defense and Prosecution, are not evidence," clarifying that such comments are "argument."

Acosta contends that this interaction rises to the same level as *People v. Woods* (2006) 146 Cal.App.4th 106.  There, a prosecutor stated outright that a defendant was "obligated" to put on evidence.  (*Id.* at p. 112.)  The reviewing court rejected any notion that a defendant had an obligation to present evidence.  (*Id.* at p. 113.)  However, the case before us is readily distinguishable.  Here, the prosecutor did not intimate, or state outright, that Acosta had any obligation to present evidence—whether to prove A.C. and L.C. lied or otherwise.  Instead, she highlighted that two women came forward and identified Acosta as their assailant and that the jury must choose whether to believe them.

The jury received extensive instruction on the burden of proof in this matter.  At the start of the trial, the jury received CALCRIM No. 103 regarding the presumption of innocence, the People's burden of proof, and reasonable doubt.  They also received CALCRIM No. 220, which covers substantially the same information.  Because Acosta introduced character evidence for non-aggression, the jury also received CALCRIM No. 350, which reminded the jurors that they can take that testimony "into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."  The People's burden arose in at least 12 other instructions the jury received.[3]  Given this volume

---

[3]    These include CALCRIM Nos. 355, 359, 1045, 3175, 1030, 1203, 1000, 1701, 3181, 1215, 1191A and B, and 3517.

13

and clarity of instruction, it is not reasonable to presume the prosecutor's remarks somehow lessened or shifted the burden of proof. (*People v. Marshall* (1996) 13 Cal.4th 799, 831–832.)

Considering the nature of the comments, the clarification that arguments are not evidence, and the instructions the jury received, there is no reasonable likelihood the jury would have understood the prosecutor's remarks to reduce the burden of proof or to contradict the unchallenged instructions they received. (*Centeno, supra,* 60 Cal.4th at p. 667.)

### III.  DISPOSITION

The judgment is affirmed.


                                                              RUBIN, J.


WE CONCUR:



IRION, Acting P. J.



DO, J.


14